I hope you're happy to hear from you, Mr. Hayes, in INP v. Live Nation. Good morning. May I please the court? I am Robert Hayes. With me at council table is Abby Sokonis on behalf of It's My Party, Inc. and It's My Amphitheater, Inc. In the last paragraph of its opinion, the district court below concluded that Live Nation is undisputedly large and utilizes its size and global reach to sign artists to exclusive contracts and to steer them to perform in its venues. I would submit to this court that there is substantial evidence in the record  that Live Nation has engaged in anti-competitive conduct for which it should be held liable under Sections 1 and 2 of the Sherman Act because that conclusion demonstrates that Live Nation is using what its own CEO described as its incredible market power, arising among others from its size, its control of Ticketmaster, its control of the lead artist management entity in the country, to coerce artist choice and to steer artists into its venues. Under those circumstances, there is clear liability because that conduct is anti-competitive. Nevertheless, the district court granted Live Nation's summary judgment. Because of the breadth of the district court decision, there's a number of issues that were raised on the briefs. I would like to focus, absent any questions from the court, on two overarching issues. The first of which is I would submit that the real reason for the court's decision is set forth in the sentence it writes immediately after the conclusion I just concocted. The court states, plaintiffs are seeking relief that would only have been realized if competition were reduced. I would submit that that's not a valid or even a relevant consideration in this case, that the focus of an antitrust case is on the defendant's conduct, whether it violated the antitrust laws, whether its conduct was anti-competitive. Where is the evidence that artists were coerced into using Nissan in order to receive promotional services elsewhere? Well, the evidence that the artists were coerced is manifold. First, it is the overarching artist's choice regressions that Professor Elhage performed. These are regression analyses that show to a 99% statistical certainty that Live Nation, its conduct is influencing artists to choose Live Nation venues, Nissan and other venues. You have no direct evidence? No, we do have direct evidence, Your Honor. Well, regression analysis isn't direct evidence. All right. But we do have, beyond the regression analysis, we do have direct evidence. For instance, we cited numerous instances where it is clear that artists have preferred to play Meriwether. Well, at the same time, they wanted to participate in the Live Nation tour. In each of those instances, Live Nation specifically stated Meriwether cannot happen. You will not perform at Meriwether. Well, I thought the basis for those choices, though, were a sweetening of the pot. First, that's not true. There is no evidence in the record that Live Nation sweetened the pot. Clearly, there is no evidence in the record that Live Nation in any way increased the compensation or adjusted the prices for the Baltimore, Washington appearance that's at issue. Absolutely no evidence. Secondly, the only time, there's one instance. So are you conceding that there may have been an increase in compensation at other venues? I was about to say that. You read my mind. There is one instance, only one, where it was with respect to Nine Inch Nails. I believe it's 2006 appearance. After Nine Inch Nails finally conceded that it would appear at Nissan, Live Nation adjusted its compensation at other venues where it has monopoly power. And what it's really doing is saying, I am not going to pay you fair compensation in a market that I control unless you also appear at Nissan. That was one instance. So is one instance enough, or do you need to show more? Well, what I'm suggesting is that's the only instance where compensation was adjusted. In every other instance we present, we pointed to, in fact, there was no changing of the artist's compensation. For instance, again, in the 2006 tour by John Mayer and Sheryl Crow, we cited in our briefs, but it's also in the record, that the artist repeatedly, for instance, at pages 2835 and 2836 of the record, the artist's management wanted a tour where Mayer and Crow would appear at Murrayweather, they would then go to Charlottesville, and they would not play Nissan. Live Nation specifically stated, that's not going to happen. There's a whole series of internal emails within Live Nation. For instance, it basically ends with a regional president saying, I will break the manager. And he did break the manager because Mayer and Crow appeared at Nissan without any change in their compensation. Isn't it possible that a great many artists would have appeared at Nissan for many, many other reasons than simple coercion? They may just have a more attractive overall tour package, which is offered by Nissan. That would be one explanation. It may be that nationwide businesses are able to control costs, and as a result, to out-compete INP in allowing compensation to artists. It may be that artists want to associate with a well-known name such as LN. It has better recognition as a concert venue than Murrayweather, and Nissan could well have a better name recognition in the Baltimore-Washington area than Murrayweather did. The two venues are not identical in their seating capacity. Nissan has a significantly larger seating capacity. And more fixed seats. So my question is, there are so many different market explanations and legitimate explanations for why some artists would want to choose Nissan. And I don't see, I'm just not sure where the evidence of coercion to choose Nissan exists. Your Honor, I will answer your question in two parts. First is, a lot of what you're raising, questions are not really in the record. And by that I mean, we have presented substantial evidence that Murrayweather is considered to be the better venue. And Nissan's excess capacity is only relevant if you're an artist who reasonably expects they're going to sell more than 19,000 seats to reach 25,000. And also, are you going to sell it at a venue that is, we've given you evidence throughout, that is not considered to be as good a venue as Murrayweather. It nowhere near draws the fans like Murrayweather. Among other things, Murrayweather is sort of like the Wrigley Field of music venues. It's a historic venue. Artists consistently recognize it. Fans consistently recognize it. And you can go through all these reasons, but we gave you, the court, an artist choice regression that says absent these tying conditions, artists choose Murrayweather, I believe it is something like 75% of the time, I'm sorry, 84% of the time. Well, but that means they don't choose it 15% of the time, and according to at least one treatise, that's not, you lose. No, well, I disagree with that. One is because that 15% also includes instances where compensation was paid to Live Nation in order to allow the artist to appear at Nissan. That 15% also incurs. I thought 10% was a benchmark. One of the people who I guess whom I respect in this field is Professor Arita at Harvard, and he's studied antitrust for a long time, and he says, look, if there's a 10% rate where somebody is not choosing a tied product, that's pretty significant. Now, your opponents claim that even LN-booked artists could choose Murrayweather over Nissan, and not only could they, but they did 14% or 15% of the time. If you take Professor Arita, and he's probably as good an antitrust scholar as I think there is, that's pretty significant. What Professor Arita is saying is that is in the field of where you're trying to show through indirect evidence that there is, in fact, a tying condition. The time that's left available to me, just two really quick points I would like to make to the court, is the United States Supreme Court has held, the Second Circuit has held, the Third Circuit has held, this court has held, the Sixth Circuit has held, where you have an unremitting policy of a tie-in. By an entity with market power, a tying claim is established. You do not need to establish coercion, and the reason is because that tying condition in and of itself forecloses competition on the merits. In this instance, you have unrebutted evidence that the district court didn't even address of an unremitting policy of tying by Live Nation. It was conceded by the CO. It was conceded by regional vice presidents. Live Nation even markets that policy in order to get other venues to allow it to manage them. The tying policy has to be successful, doesn't it? No. Well, actually, it does not. For instance, if you look at Jefferson Parish, the Supreme Court decision, the court held that you absolutely do not have to be successful. What is the conduct that is a tie, is anti-competitive, is imposing the tie, and you have to distinguish between bundling, where you say, I'll sell you A, I'll sell you B at their respective prices. Well, the problem is if these tying products, the tying theory can merge into a point where it prevents national companies or local companies, for example, from offering packages. It doesn't. Yes, it does, because that is the danger of tying theory in antitrust law is it simply prevents marketing of packages, and marketing of packages is done all the time. No, but that's what you're just – no, it doesn't, because that is bundling, is what I just said, that that's tying A. It's saying, I'll sell you promotion and venues. Here's my price for those two. If you take them both, or if you take them all, I'll lower the price. But where you transform from legitimate competition to anti-competitive conduct is when you say – You're offering a package which somebody can accept or which somebody can decline. But when you have market power and you say, I will not sell you A in any event unless you choose B – But you don't have evidence of that. We do. As I just said, the CEO testified to that. The regional vice presidents testified to that. We provide you internal documents from Live Nation where it states – where they go to markets and say, owners of venues, we will not put our shows in your venues unless we're managing it. And we have that in the record. One regional vice president said, was incredulous, saying something along the line of, why would we ever put our tours into somebody else's building? They do it over and over. You have the whole issue – the whole example we gave you with Nickelback, where Nickelback wanted to do two venues of Live Nation. And Live Nation said, no, we will not allow you to market in those venues, appear in those venues, unless you do a package of 15. And even when the owner of the venue that Nickelback wanted to play objected, Live Nation said, you need to understand, we may lose profits here, but we'll get them down the line because, ultimately, people are going to be forced to do what we want them to do. And, in fact, that is what Nickelback did. By 2009, it signed a 360-degree deal with Live Nation. And my concluding comments to the court at this point would be, the judge – the court below resolved material issues of fact. It certainly – we have evidence in the record which the court decided not to believe and to accept Live Nation's evidence. We have evidence – it made questions – decisions of credibility, particularly as to Professor Elhage, which simply cannot be made on a motion for summary judgment. It relied on evidence that was not even in the record – or made conclusions. For instance, it found that it's more profitable on national tours rather than local tours. It cites to Live Nation's brief in support of that position, and, in fact, that's not evidence, and that brief didn't say that. At the end of the day, we have put in substantial evidence of each of these issues under theories that even Professor Arita recognizes, and we were entitled to a jury trial on those issues. Thank you, Your Honor. Good morning, Your Honors. Jonathan Jacobson for Live Nation. Apologize for my cold in advance. Sorry, we all have them. Broadly, Your Honors, the claims involve really two central issues, market power and whether there's exclusionary conduct. And the argument just now focused on exclusionary conduct, and with the court's permission, I'd like to start there as well. The principal argument is tying. Now, we have to be careful, and counsel was not, to look at the various ties involved. One is promotion, that we would refuse promotion in order to coerce the artist to play at Nissan. Literally no evidence in the record to that effect. There is the argument that you can't play. You say literally. Are you saying that there is some evidence in the record? No, there is no evidence whatsoever in the record. So let's talk about that. There is an e-mail that says Meriwether can't happen. It's an internal e-mail. It's not a communication to the other side. There's not a single instance where Live Nation refused to promote an artist unless the artist played in Nissan. If there were, we would have heard about it, and we haven't. And through extensive district court proceedings, extensive briefing in this court, a 17-volume appendix, there's no evidence of that. Let me take – I want to start out with the local booking point, if the court will allow me, and then get into the various vignettes that counsel has raised. So the argument that dashes the tying completely is that artists are free to book locally. Book locally means that the artist will communicate with the venue and the promoter in the local area of the artist's choice. There is no conceivable tie in that arrangement, and it's – What you're contending is that the market here is a local market, and you've got INP and LN competing in that local market to offer the best overall deal for artists and to attract artists, and that that's a competitive market, and that it endures to the benefit of the consumers in this case, which are the artists who perform. Absolutely, Your Honor, but let me make clear that my argument on exclusionary conduct does not depend on market definition. We can assume arguendo plaintiff's market definition, and there's still no proof of exclusionary conduct, which is an essential element of all claims. So if you can book locally, you can avoid any kind of tie arrangement, and the evidence is clear that booking locally is a viable option. Roughly half of the nation's concerts are booked locally. Of the major plaintiff's term, of the major artist's performances in the D.C.-Baltimore area, over 40 percent were booked locally. That's from L. Haig's own figures. So there's no question that this is a viable alternative. It precludes any argument of tying, and under this Court's decisions, the availability of that option, the free availability of that option precludes any tying argument as a matter of law. Now, even if we ignore this a la carte option, there was, as we've been talking for the last 20 minutes, no evidence of coercion. Now, I do want to address the specific instances that counsel raised. First of all, counsel said that Nine Inch Nails in 2006, that there's no evidence that they got increased compensation in return for performing at Nissan. Completely wrong. The document is Volume 16 of the Appendix 6446-48. It says, in consideration of playing at Nissan, we're raising your overall guarantees $150,000. Absolutely unambiguous evidence. John Mayer, the Mayer Crow Tour in 2006, the evidence is that they were given 100 percent. Usually it's 85, 90, 95 in some cases. Live Nation agreed, as a result of the decision to play Nissan, to up the percentage of the gate to 100 percent, and that is specifically mentioned in Volume 5 of the Appendix 1533. This is not in the brief, so I'm mentioning it now. Jason Garner's testimony makes very clear. And there's no contrary evidence. There's no issue of fact here. Now, all of the matters that counsel raises involve nothing more than active negotiation, and it's very clear that negotiation is not tying. That's explained really well in the Aretha Hovenkamp treatise, and it's been the law for some time. Now, if a negotiation results from simply market power, or if the favorable pricing terms result from one company's ability to hold down cost, or one company's successful strategy in one sense or another, that can't be tying. I mean, the problem I'm having here is that the tying theory that's advanced here is precluding market behavior and market negotiations, where all contracts and all negotiations are functions, in one sense, of what the respective party can bring to the table. And sometimes people bring to the table, you know, some heavy leverage, but that may be because of a successful business strategy on their part, or that may be because they have successful marketing strategies, or they've made their name familiar or what have you. But the problem is this tying stuff can undermine just simple, straightforward, contractual negotiation. Your Honor, I couldn't have put it any better myself. I completely agree with that. I would like to talk briefly about the regressions. The idea that the regressions prove coercion is simply false. Professor L. Haig testified to this effect himself. He said that an artist would be shown to be foreclosed in his regressions even if the artist hated Meriwether and wanted to play Nissan instead. All the regressions do is track where the artist played. The only other variable in the regressions, and this is Volume 12 of the Appendix 4627-35, the only other variable is artist popularity. There's nothing there that even purports to measure coercion or forcing or artist choice. It's just where artists played. It doesn't prove coercion by any shape, manner, or form. Because they can play at a particular venue for a multitude of reasons. Yes, exactly. Did the professor exclude other competitive venues? I was sort of surprised that he limited it to amphitheaters. It seems to me that there was plenty of evidence that artists might go to an arena one year, amphitheater the next year, or even in the same year. There was nothing that clearly defined amphitheaters as a viable market definition. That's absolutely right, and Judge Motz had that completely right, Your Honor, in rejecting that market definition. A great example that we've been talking about is Nine Inch Nails. Nine Inch Nails has played Merriweather. It's played Nissan. In 2007, it played the Verizon Center, promoted by Mr. Hurwitz. Clearly, there are alternatives. If that's so, I'm wondering why you sort of quickly relinquished your argument with respect to market. Because it seemed to me the district court was very impressed by the fact that this market opinion was sort of after the fact. It was working backwards instead of looking at where the demand was and the nature of the demand and interchangeability, which would have included more than just amphitheaters. Judge Niemeyer, if I gave the impression that I'm not advancing the market definition and market power arguments, that was a misimpression. We absolutely advance those. They're covered extensively in the brief. I just, because the argument preceding me focused on the coercion issue, I've just been focusing on that. But absolutely, Judge. Does that work in tandem with the fact that there are local booking options? It does, but as I said, Your Honor, you can reject exclusionary conduct, even if you accept plaintiff's market definitions. We believe those market definitions are unsound, and I can get into that if you'd like. In particular, on the amphitheaters. If you accept that market definition, there are only two choices then, right? Merriweather and Nissan. Because he not only limited to amphitheaters, but amphitheaters of a certain size. In the Baltimore-Washington market, there's only those two, isn't there? Yes, Your Honor, and that's why. What's wrong with all the other arenas and performing centers? Well, nothing. And that's why we described the analysis that Professor Elhague did as outcome-oriented. When you draw a circle around the plaintiff and defendant, it's hard to argue that that's anything other than outcome-oriented. I did want to mention they also allege exclusive dealing. Judge Diaz, your opinion in the Colin v. DuPont case really controls this. They don't show the percentage of the market foreclosed by exclusive dealing. They don't even purport to. Professor Elhague said he said that. That wasn't intended to be an absolute. It's just sort of a benchmark of sorts, right? Yeah, but there has to be some evidence, and there's none, because Professor Elhague admits he didn't even try to calculate the foreclosure from exclusive dealing only. So if the tying claim goes out, the exclusive dealing claim necessarily goes with it, and our expert, Professor Klein, you can accept this or not, pegged the foreclosure from exclusive dealing arrangements at zero in some years, at a high of 6% in other years, and that's clearly insufficient under any exclusive dealing analysis. The only way that Professor Elhague could get around that is to combine the foreclosure with what he said was foreclosure from tying, and even there he only came up with numbers of 23% to 30%, and under this Court's per curiam affirmance of the RJR case, that level is insufficient. RJR pegged the minimum level at 34%. So no tying, no exclusive dealing. I do want to talk about what we call the refusal to deal claim. All of the testimony that Mr. Hayes is talking about goes to that claim. Will Live Nation rent out its venues to other promoters? Now, we believe that the Trinko case makes very clear  We also believe it's very clear, I think it's undisputed on the record, that these plaintiffs never asked to use a Live Nation venue. They're simply talking about requests by others, and their own submission to the Justice Department, which is in the record, says that Live Nation does rent out its venues 8% of the time. So even on multiple grounds, the refusal to deal claim goes out. I do have a few minutes remaining, so if there are no other questions on exclusionary conduct, I would like to turn to market power and market definition. I want to start right in with market power. So this case involves competition for the business of artists. And the means of competition is payment of the guarantee and the percentage of the gross. And it's a buying case. So an exercise of market power here would mean reduced compensation for artists and reduced numbers of shows. That's the reduction in output. Not only is there no evidence to that effect, but the plaintiffs have vigorously argued the opposite. They've argued that Live Nation pays artists too much, not too little. They originally, in fact, claimed predatory pricing. And Mr. Hurwitz and their industry expert, Barron, still say that Live Nation overpays. Mr. Hurwitz, in fact, tried unsuccessfully. This is the videotape for which there's a link on page one of our brief. Tried unsuccessfully to get Live Nation to fix prices, which Live Nation rejected because he felt that Live Nation was paying too much, not too little. So the lack of power over price is beyond dispute. And the output story is the same. Plaintiff's consistent gripe is that there are too many concerts, not too few. So there is a complete lack of power or even an argument of power over price or output. And that means no market power, no matter how the markets are defined. But even so, plaintiffs also fail to raise an issue of fact on relevant markets. And on venues, Judge Neimeyer, the key was that Professor O'Hagan plaintiffs never focused on the real question, cross-elasticity of demand. The question in this case is, if there was a hypothetical monopolist of Nissan and Meriwether combined, because that's the market, could that hypothetical monopolist reduce compensation to artists in a manner that would not lead artists to go to other venues, such as the Baltimore Arena or the Verizon Center or Wolf Tramp? And the evidence on that from the plaintiffs is none. But let's take a look at what Mr. Hurwitz himself testified in his deposition. He testified that even if Nissan and Meriwether stopped competing, competition from non-amphitheaters would keep bidding prices competitive. That's also on a video clip, and it's volume five of the appendix at 1564-65. That testimony gives us the hypothetical monopolist test that everyone agrees should be used to define the markets. Under plaintiffs' market definition, this hypothetical Nissan-Meriwether cartel would be a complete monopolist. There's your hypothetical monopolist with 100% of the market that plaintiffs define. But his testimony makes clear that this hypothetical monopolist could not reduce prices below competitive levels because, and he says this flat out, competition from non-amphitheater venues would keep the bidding competitive. That precludes any argument for combining the markets to amphitheaters. Now, just very briefly on promotion, we do not contest plaintiffs' product market definition. We vigorously attack the geographic market definition. And the undisputed facts in the case show that the markets here are local. Every concert case, and there have been many, there's been a lot of litigation in this field, every case either assumes or finds that the relevant market is local. It's a square holding of the Heerwagen case in the Second Circuit. It's similar to supermarkets. Supermarkets like Kroger and Safeway all operate nationally, but supermarket markets are local, as dozens of FTC cases and district court cases and all the way up to the Supreme Court have held and affirmed. So every promoter operates locally. Venue selection is local. Radio advertising, which is critical in the concert business, you need to know the DJs, you need to know the right radio stations. That's inherently local. What about your clients' promotion services? Are they local? Absolutely, Your Honor. Live Nation has local offices throughout the country for precisely these reasons. And AEG, which is the other national promoter, also has local offices all over the place. Promotion is inherently a local business. Concessions are served locally. Logistics, you have to get the truck there, you have to unload the truck, you have to set up the facilities. There's a very limited number of people who are going to travel great distances to go to a single concert. Yes, Your Honor, and that's the holding of the Heerwagen case. This is a little bit different because the customer is the artist, not the consumer. But the analysis is largely the same. And it explains why the advertising, for example, is local, because what you're aiming at are customers who will come to the concerts without having to undergo an extraordinary amount of inconvenience or an extraordinarily long trip. They'll just wait for a concert to come to their area. But they're not going to take long-distance trips and pay motel fees or hotel fees or whatever to attend a particular concert. Exactly, exactly. Let me ask you, you made an interesting point there that puzzled me when I was reading this. The demand is from the artist, the performer, in the traditional analysis, but somehow there's a link between that demand and the derivative demand created by the public. In other words, the fact that Baltimore, Washington, is an area where people will go to a concert, but they may not go up to Pittsburgh or they may not go to Atlanta, seems to somehow relate to the demand created by the artist. I'm not sure how you articulate that or whether that's true, but intuitively it seems like there is a background demand created by the public and how far they will go to a concert. Absolutely, Your Honor, and I think that's similar to the point that Judge Wilkinson was making. My time has expired. Can I have 15 seconds just to address something in plaintiff's reply brief that we haven't talked about? No, we've been strict with them, so I think I'm going to be strict with you. Thank you, Your Honor. Thank you very much. Mr. Hayes. Mr. Hayes, one thing that concerned me, because you were saying, well, there's this expression from LN's CEO and all the rest. It always bothers me, or it sometimes bothers me, that antitrust cases, they're brought in the nature of competition and yet their effect can be strongly anti-competitive. And Mr. Hurwitz, who is the principal of IMP, indicates in numerous statements that IMP's frustration with LN is because LN was, quote, encroaching on their local turf. Well, if you have this idea of everybody has their own local turf, that's monopolistic in its own right. Yet Mr. Hurwitz goes along and complains that the scourge of the industry, quote, the scourge of the industry is too many shows. And then he makes overtures to LN to leave town, close up shop, and let's stop bidding against each other and let's achieve lower bids for the artists to play in the Washington-Baltimore area. So why isn't the driver in this from the beginning been perhaps with the threat of antitrust litigation to get LN out of the Baltimore-Washington area so that IMP can have that area, that particular area, all to itself and have pricing structures to suit itself to the detriment of the artist involved and to the public? And so what I'm wondering is if we buy off on what you're trying to say, we just may be moving in the direction, in a very anti-competitive direction, in which larger companies like LN are scared away by this kind of litigation from entering and being a part of a local market. And we're turning local markets into more monopolistic markets because larger companies, they don't necessarily snuff out competition. They can be pro-competitive. And big is not invariably bad. Sometimes big can be an indicia of success. And all these cases come to us in this David and Goliath posture, but it's just not that simple. And I guess the bottom line to my question is if we go with what you're saying, the results seem to me to be quite the opposite of what the antitrust laws want to achieve, which is anti-competitive. Your Honor, we are bringing a number of responses to your question. One is we are bringing traditional theories of antitrust liability, of tying, monopolization. I would submit you could never say trying to enjoin conduct that the courts and the Congress have determined to be anti-competitive is in and of itself reducing competition. Secondly, I would almost use your question as Exhibit A, if I could, to why this is a case that requires a jury trial, because you have a perception of the record that Live Nation has promoted. In fact, the record establishes at least genuine issue of fact. I'm quoting from Mr. Hurwitz. No, but could I just? Mr. Hurwitz, when he was talking about too many shows, he was talking about artists that were not even in this market, artists who he believes do not generate enough popularity to appear at big venues that they should be going to theaters or to clubs. That concern is not only shared, it's in the record, by Mr. Hurwitz, but executives at Live Nation. It's a completely side issue. Secondly, thirdly, actually, Live Nation approached. It wasn't actually Live Nation. This was all well before these events. Live Nation's predecessor, Clear Channel, tried to acquire IMP, just like it's acquired numerous other independent entities throughout the country. Live Nation wanted that combination. IMP rejected it. IMP has never shied away from price competition with Live Nation. What Live Nation cites is a distortion of an email that Mr. Hurwitz. What about on the testimony on page 1560 of the record, where Mr. Hurwitz proposes that IMP and LN stop bidding against each other so that they can achieve lower bids for artists? No. I believe what you're talking about is an email. There's artists who have, even though Murrayweather and Nissan compete, there are some artists who have sufficient popularity, given the size of that market, to appear at both venues. He says to Live Nation, look, why don't you think of Murrayweather as gravy, that the artist can appear at Nissan, the artist can appear at Live Nation? This whole idea and the email about Live Nation leaving town, that all arose in a circumstance where Live Nation was proposing that Mr. Hurwitz would run the combined entity, and it said, if you do that, we think all the operational expenses should be against your size because we're, quote, leaving town. So Mr. Hurwitz actually responds by saying, leaving town, if you want to stay, stay, work. If you don't want to leave town, don't leave town. But I'm not going to absorb all the operational expenses. So they're taking stuff out of context to give an impression. And in an appellate argument or a motion for summary judgment, you can't put it back into context. That can only be done by a jury. And just one thing also, if I could just leave the court with your question. I was strict with your opponent on the, you want to just wrap it up real quickly? Just on the whole idea of the amphitheater market, we have the court below said our industry expert could testify that there are artists who prefer amphitheaters. It's not a question of arenas being so, amphitheaters being so inherently good that everybody wants to be there. It all goes to the artist's popularity. And there are certain artists at a stage of their career that need to be able to perform in amphitheaters. Can they supplement it with other venues? Yes. But for a tour to be successful, they have to be in an amphitheater. All right. Thank you, sir. Thank you. Popularity varies. We'll come down in Greek council and move into our next case.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Albert Diaz